In the Matter of the Application of HOUSE OF THE HOLY FAMILY for the Transfer and Commitment of EVELYN " MONTANA " to Another Institution.*

Domestic Relations Court of New York, Children's Court, Richmond County,
September 12, 1941.

* This opinion as here published substitutes fictitious surnames and disguises certain other details, in consonance with the spirit of section 52 of the Domestic Relations Court Act of the City of New York.

*Fred J. Mancuso*, for Josephine " Benito " (mother).

*Thomas R. O'Brien*, for " John Montana " (father).

SICHER, J. The child Evelyn, born February 5, 1926, was graduated from public grammar school in June, 1939, and she did well also during her first term at A. High School. But towards the end of the second term her entire attitude changed, she began failing in almost every subject, and between September, 1940, and April, 1941, became unruly and truant successively at B. High School, C. Parochial School and D. Vocational High School.

The onset of Evelyn's maladjustment was coeval with the divorce of her parents and the award of her custody to the father in a May 27, 1940, final decree in his favor.

The evidence abundantly shows that there is a very strong tie of affection between the mother and Evelyn; that the child rebelled against the father's insistence that she must never see or communicate with her mother; and that his treatment of the child was largely conditioned by his vengeful resentment at his former wife and sense of injured pride at the failure of their marriage.

On April 29, 1941, the father filed a petition alleging Evelyn to be " a delinquent child, for the reason that on the 20th day of April 1941 * * * without just cause and without the consent of your petitioner, her father, guardian and custodian, she did desert her home and place of abode " and praying this court " for such action or relief as the law provides."

Regardless of whether or not the filing of that petition and the accompanying implied confession of the failure of the father's guidance constituted relinquishment of any of the legal incidents of custody, the adjudication upon that delinquency petition placed the child under the jurisdiction of this court, to be dealt with pursuant to the statute creating it and defining the functions and powers of its Children's Court Division.

Hearings on such delinquency petition were held by me on April 29, 1941, and May 2, 1941.

At the close of the April 29, 1941, hearing I remanded the child to the Shelter of the Richmond County Society for The Prevention of Cruelty to Children pending the usual investigation by the probation bureau of this court and indorsed on the petition the

following memorandum: " Testimony taken. Child and mother claim that child stayed with mother during entire period of her most recent absence from father's home; and disinterested witness (Mrs. Mae C—) testifies that she saw child at the mother's home on April 21st, 1941, and up to April 23rd, 1941. Child denies any sex delinquency. Decision reserved."

After consideration of the probation bureau's investigation report and the taking of further evidence on May 2, 1941, I adjudged Evelyn to be a " delinquent child," added to such adjudication the words " (due to ' neglect ')," and indorsed the following further memorandum on the petition: " Delinquency is due seemingly to the break-up of the home and child's resentment at having been given into custody of father by Supreme Court, Richmond County. On coming in of clinical report, consider whether neglect petition should be filed since child's conduct appears to be a direct outgrowth of the dissension between parents and father's vindictiveness towards mother."

The remand to the Shelter of the Richmond County Society for The Prevention of Cruelty to Children was continued to May 20, 1941, and examination of the child ordered to be made in the Psychiatric Clinic of the Children's Court Division of this court (pursuant to section 85 of the Domestic Relations Court Act of the City of New York).

The May 19, 1941, Psychiatric Clinic report reads in part as follows:

" Evelyn ' Montana,' age fifteen years and three months, was referred to the Clinic for examination.

" *Physical Examination:* She is a very obese girl, who is 64" tall and weighs 199 pounds.

" *Psychological Examination:* On the Stanford-Binet she obtains a mental age of 13.11 and an I.Q. of 93. Her vocabulary was practically at her age, and hypothetical reasoning slightly above. On the performance test her ability was slightly lower. On the schools skills she was considerably retarded, particularly in arithmetic, but the test brought out no gross abnormalities, and her intelligence is believed to be normal.

" *Psychiatric Examination:* Evelyn was friendly and responsive. She carried on conversation well, and tried hard to do all that was expected of her. There were some indications of emotional tension, and a slight tendency to exaggerate some statements for the purpose of impressing. It was not believed that the child indulged in wilful prevarication.

" So far as we can tell, Evelyn's conduct disorders all began about the time of the divorce of her parents. This belief is borne

out by the school reports. Evelyn claimed, and the mother agreed with the statement, that from the time of the divorce in January 1940 until the fall of the same year, a period of eight or ten months, the child was never allowed to see her mother under any circumstances. The mother claimed that she was forbidden to write to her daughter, and the daughter claimed that she was afraid to write to her mother. * * * During this period Evelyn was extremely unhappy because her father was unduly strict and rigid in his discipline, and did not allow her the rights or privileges which she thought she deserved. She asserted that she wilfully began to stay away from home and cause trouble for him, as a means of retaliation. Furthermore, she claims to have caused trouble in one school after another, for the purpose of making the father wish to get rid of her, with the belief that she would be sent to her mother to live. She described in detail and in a very convincing manner many of the hardships to which she was exposed. She was never allowed to go out with boys and seldom allowed to go out with girls of her own age. When she did go out, she was obliged to come in very early, much earlier than the other girls with whom she associated. This situation was aggravated by the fact that Evelyn, while in the second term high school, had become associated with a group of girls in the sixth and seventh term. She tried to keep up with them socially, but found herself unable to do so. It was perhaps as a result of this that she achieved somewhat of a reputation among the boys in the various schools. For infractions of her father's restrictions she was often punished physically, and the father had given her older brother instructions to punish her. On several occasions he had punched her arm so hard that he left black and blue marks there. For this the child was naturally indignant. * * *

" The mother who was interviewed today, apparently means well, but has a tendency to leave her decisions and responsibilities to others. She expressed it by saying, ' Whatever you do is all right with me.' This seems fairly significant. The father, on the other hand, is extremely rigid in his ideas, and demanding in his attitude. He positively refused to consider any plan of having the girl live with the mother or even visiting with the mother if she should remain overnight. He was not very reasonable in explaining why his daughter should be deprived of the privilege of seeing her mother, except to defame the mother's character. On the other hand, he had no desire to have his daughter back home, and said many things which showed clearly that he has practically no respect for the child and relatively little affection. When he learned in Court that she was not a virgin, this simply added fuel to the

flames, and has now given him another instrument to use against Evelyn. He has told her on many occasions that she was growing up ' just like her mother.' He expressed the belief today that she was becoming promiscuous in her sex relations and that she had no ability to avoid future involvements. It was impossible to persuade him to admit any relationship between the child's behavior and his method of treating her. Under these circumstances the chances for future adjustment in the event Evelyn is returned to his home are practically nil.

" *Impression:* This girl is believed to be an innocent victim caught between two quarreling parents, both of whom are poorly equipped for parenthood, and unwilling to consider the child's needs above their own selfish desires. Like most adolescents she has her faults, and these are probably exaggerated during this time of emotional stress. Her search for attention and affection is quite natural and normal in the light of her predicament. Being obese and in some ways not as attractive as other girls, it has been necessary for her to use other means of gaining favor with her friends, and this may have accounted for her willingness to participate in petting parties, automobile rides, etc. For the best interest of all concerned, it is believed that Evelyn should be removed from the home where she lives now, and confined for a period of time in a Catholic institution such as the House of the Holy Family. Further plans will have to await future developments."

On May 23, 1941, the justice then presiding committed Evelyn to the House of the Holy Family, an institution then maintained by Sisters of Divine Compassion for neglected and mildly delinquent Catholic girls between the ages of twelve and sixteen years.

However, within a few weeks after Evelyn's admission those in charge of the House of the Holy Family decided to terminate that particular form of service and to close the institution about September 1, 1941. That program necessitated placement of such of the inmates as the House of the Holy Family could not return to their homes or elsewhere without court authorization. In view of the shortness of Evelyn's sojourn in the House of the Holy Family, the insufficiency of her readjustment during such brief interval, the divorce of the parents, and the proved inadequacy of the father's home, the only course open to the House of the Holy Family was to request the committing court to dispose of Evelyn; and the sole form of procedure available was an application for the transfer and commitment of the child to another institution.

Upon such an application before April 21, 1940, this court would have had the power only either to grant or deny the request for transfer to another institution, and in this instance such denial

would have been precluded by the closing of the House of the Holy Family. Fortunately, however, the Legislature in 1940 added to section 86 of the Domestic Relations Court Act of the City of New York the following apposite provision:

" 4. Upon any application for transfer of a child from one institution to another, the court shall have power to discharge the child or to place the child on probation or under the supervision of the court." (Laws of 1940, chap. 671, effective April 21, 1940.)

Accordingly, there now exist the following alternatives, namely, (1) to transfer Evelyn to the only type of institution still available (e. g., St. Philomena's Training School, St. Germaine, or New York State Training School for Girls), many of whose charges are aggressively delinquent; or (2) to discharge Evelyn from further care of this court, or (3) to return her to her father's home on probation, or (4) to place her on probation in the mother's home.

The facts developed and impressions gathered on two extended hearings satisfy me that the welfare of the child calls for adoption of the fourth alternative.

Actual experience has conclusively demonstrated the futility of the third alternative. The father has clearly manifested that any affection for the child is engulfed by his over-powering resentment towards the child's mother and stepfather. And upon the August 22, 1941, hearing he coldly voiced the opinion that Evelyn would become a loose woman unless confined in a correctional institution until her full maturity.

The outbreak of Evelyn's abnormal behavior is so definitely connected with the separation from the mother and her subjection to the rigid, unsympathetic and unsuccessful care of the father that she seems now entitled to the experiment of a demonstration whether or not return to normal behavior and development will follow from heeding her plea that she be restored to the loving care of the mother.

The evidence, including the sworn oral report of a home visit by an able, experienced probation officer of this court, shows that the mother is now living a quiet, decent life in an immaculately-kept apartment, located in a good neighborhood near a public high school; that shortly after entry of the final divorce decree the corespondent and she became husband and wife by ceremony duly performed in the State of New Jersey; that they have since lived together in the manner usual for married couples and in a community distant from Staten Island; that the mother devotes all her time to the care of their serene, modest, well-ordered home, which is shared also by the stepfather's industrious nineteen-year-old daughter by a former marriage; that this young woman is

deeply attached to her father and fond also of the stepmother and Evelyn; and that Evelyn will be welcome in the mother's new home.

It may develop that the child has been so irretrievably harmed by the parents' dissension and the year's unhappy association with the father apart from the mother that she will not do well upon probation. But the prognosis is not unfavorable; ordinarily commitment to an institution of the types now available is made only after probation has been first tried and has failed or the delinquency pattern was already fixed before the child became known to this court; and there is still time to commit if Evelyn does not progress in her new environment under the guidance of the Probation Bureau of the Children's Court Division in Queens County (where the child will be residing).

The foregoing program seems to me the only one fair to the child and consistent with her welfare. It is squarely within the authorization of subdivision 4 of section 86 of the Domestic Relations Court Act of the City of New York, in respect of a child over whom this court has acquired jurisdiction and conditionally committed to a child-caring institution; and I am not persuaded that such program is precluded by the provision of the May 27, 1940, divorce decree awarding the custody of Evelyn to the father.

Placing the child on probation in the mother's home is an exercise of the jurisdiction of this court. It is not in form, or even real substance, a modification of that Supreme Court decree, although, of course, the practical effect is to alter the place of abode and care of the child. But that merely happens to be an incident of the exercise of the jurisdiction of this court, conferred by the adjudication upon the father's petition charging incorrigibility and based on facts occurring subsequent to the May 27, 1940, decree of the Supreme Court.

As above stated, the change in the mother's legal status since May 27, 1940, the decency of her present mode of life, the atmosphere of the home in which Evelyn will be supervised by the probation bureau of this court, the rejection of the child by the father, the disastrous results of his attempted care of her between May 27, 1940, and April 29, 1941, and the strongly voiced preference of the fifteen and one-half year old daughter to live with her mother, are all new factors which did not exist at the time of the entry of the May 27, 1940, final divorce decree and which would doubtless now lead to modification of the custody provision therein on proper application. But as a practical matter this court could not defer until after such modification its action in the instant proceeding under section 486 of the Penal Law and subdivision 4 of section 86 of the Domestic Relations Court Act of the City of New

York    House of the Holy Family was about to close and the new public high school term to begin, and an indefinite continuance of the remand in the Shelter of the Richmond County Society for The Prevention of Cruelty to Children might have militated against the success of the probation experiment.

This detailed memorandum is an elaboration of the oral discussion spread upon the record.  It has been prepared and filed primarily as a guide upon any review, especially in the event of the father's carrying out his attorney's avowed plan of proceeding not by appeal to the Appellate Division (on a complete record) but merely by habeas corpus* or motion in the divorce action.  It is earnestly urged that upon any such resort to the Supreme Court the father be required to furnish transcripts of the April 29, May 2, May 23, August 22 and August 26, 1941, hearings in this court. Otherwise, there might not be presented a true picture of the reasons leading to the action necessitated by the closing of the House of the Holy Family.  For, I am solicitous that the child's welfare be not impaired by the specious argument that the exercise of the jurisdiction of this court over a delinqent child, so adjudicated upon the father's petition, constitutes an improper encroachment on the jurisdiction of the Supreme Court or a disregard of the legal and moral factors underlying the May 27, 1940, award of custody to the father.  No such technical and unsound contention should prevail.

" The rights and wrongs of the contending spouses will be the decisive consideration in the action for annulment.  In the proceeding by habeas corpus the supreme consideration is the welfare of the infant."    (People ex rel. McCanliss v. McCanliss, 255 N. Y. 456, 461.  See, also, Kruczek v. Kruczek, 29 N. Y. Supp. [2d] 385.)

In the clarifying light of actual events since the May 27, 1940, pro forma award of custody to a father whose inadequacy has since been demonstrated, the return of the child to his home now would spell the child's certain doom.

Notice shall be given to the respective attorneys pursuant to the subjoined direction.

---

* Writ of habeas corpus sued out by child's father was dismissed and divorce decree amended to grant custody of child to mother (Mr. Justice Henry G. Wenzel, Jr., Supreme Court, Special Term, Kings County, N. Y. L. J. Oct. 14, 1941, p. 1032).