In the Matter of " MARIA BOLOGNA " and Another, Infants.*

Domestic Relations Court of the City of New York, Children's Court,
New York County, June 5, 1950.

---

* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details in consonance with the spirit of section 52 of the Domestic Relations Court Act of the City of New York (L. 1933, ch. 482).

*John P. McGrath, Corporation Counsel (Mathilda Miller* of counsel), *amicus curiæ.*

*Theodore Perlman* for father.

SICHER, J. " No decision by any court can restore this broken home or give these children what they need and have a right to — the care and protection of two dutiful parents. No court welcomes such problems, or feels at ease in deciding them." (*Bunim* v. *Bunim,* 298 N. Y. 391, 394.)

These words, written in an opinion on the issue of custody in a divorce action, are unfortunately apposite to the analogous problem here presented, namely, how best can be mitigated for the two young children who are the subject of this court's " neglected child " jurisdiction the handicaps of the situation which caused them to be so adjudicated.

It is the " law of the case " that they are " neglected children " within the meaning of subdivision 17 of section 2 of the Domestic Relations Court Act of the City of New York, an adjudication to that effect having been made by Justice BOLIN on February 24, 1950, no appeal having been taken, and the time to appeal having expired.

At the point when the matter first came before me, as the Justice sitting on April 20, 1950, in the New York County Children's Court Division, Part II, the sole question open for determination, and then raised, was whether the welfare of these two children called for their continuing to live in the father's home under the care of a succession of hired housekeepers or whether they should be placed in an institution or

a boarding home or whether they should be tried out in the mother's custody subject to the continued supervision of the court. That restricted scope of my power and duty to exercise at this stage this court's jurisdiction " to determine the question of the rightful custody of such children if their custody is subject to controversy and such custody or controversy relates to their immediate care " (N. Y. City Dom. Rel. Ct. Act, § 61, subd. 1) is frankly conceded in the brief submitted by the father's able attorney, as will appear from the following excerpts: "It is not the purpose of the writer to have this Court act as an Appellate Tribunal insofar as the finding of ' neglect ' by Justice BOLIN   *   *   *.   While the writer therefore must start out with a finding that the children were ' neglected children ', because of the finding by Justice BOLIN, and therefore the father would be an improper guardian,   *   *   *.   Because of such a finding it is not the intention of the writer to discuss the facts adduced before the Court so as to determine where the fault lies in this unfortunate matter. We are concerned only with the welfare of these two small children, and it is only with that phase of this petition that the writer will refer to   *   *   *   Because of the finding of ' neglect ' the children undoubtedly are to be sent to the mother and be placed in her custody although admitting she left her home and her children in May of 1949 with no concern as to who would take care of them. Under the circumstances we have a right to ask if custody is to go to the mother where are they to be housed?   *   *   *   We therefore respectfully urge that the children remain in the custody of the father until such time as the mother is able to obtain an apartment of her own so that she can devote her full time and attention to the welfare of these children. They should not be placed in an institution because they would not be happy in such place. The children have already had the experience of boarding for a short time in a Catholic boarding school and the father had to take them out because they were unhappy there."

No useful purpose would be served by a detailed narrative of the facts developed on two hearings before me, which included talks with each of the children in chambers. Suffice it to mention only a few salient facts and inferences therefrom and to state that *all* of the evidence, including the demeanor of the parties and of the witnesses, has been earnestly considered in arriving at this decision.

The children are the products of a marriage which was never harmonious but marked by several separations and much tension. between two neurotic parents. The mother candidly admits that she married the father in the hope of improving her own not too happy lot and of establishing a home for herself. But very soon she discovered her mistake, and respondent's sadism finally drove her to the point where she had to move out of the home in June, 1949, to avoid a complete breakdown.

Her anxiety seems to have lessened since she is no longer exposed to the stresses of living with the father. And from the content and manner of the parents' testimony I have reached the same conclusions as those expressed in the February 15, 1950, reports made by one of the psychiatrists of this court's bureau of clinical services with respect to his examination of the parents: '' It is the examiner's impression that she '' (the mother) '' has a more stable personality than her husband. She is a very anxious individual and it is felt that she would improve with therapy and would be better able to control her children. Diagnosis: Anxiety reaction ''; and, as to the father: '' Diagnosis: Inadequate personality. Schizoid trends.''

The maternal care so vital to children of tender years the father attempted to furnish by a succession of hired housekeepers, the latest of whom is a young widow who recently lost her husband and two children in an automobile accident and who manifested on the stand a belligerent partisanship, her own tragic instability, and the liklihood that she would actively seek to come between these children and their mother.

There can be no doubt that these children wish to live with the mother, in the maternal grandmother's home until other quarters are available, in preference to their present environment; and they were disappointed and upset that they were not permitted by me to go from the court with their mother at the conclusion of the last hearing.

If the father really cares for his children as deeply and genuinely as he professes, and does not regard them primarily as pawns in the battle with the mother, he will *voluntarily* contribute to their support while they are residing with the mother in the maternal grandmother's home and assist the mother to set up a separate apartment; and he will then contribute to the maintenance of that apartment a sum sufficient to enable the mother to cease work so as to stay home and take care of the children.

For the foregoing reasons, especially the tender age of the children, their immediate care is hereby entrusted to the mother, subject to the continued supervision of a probation officer and further orders of this court; and they are hereby paroled to the mother under such supervision.

The father is therefore hereby directed to deliver the children to the mother no later than noon on June 10, 1950.

And if, by June 15, 1950, the parents have not agreed upon financial arrangements, the matter should be forthwith referred to the Family Court for appropriate support order proceedings.

Notice shall be given pursuant to the subjoined direction.

(Supplemental opinion, January 26, 1951.)

*Angelo E. Nigro* and *Benjamin Lebenbaum* for mother.

*Kaufman, Ascione & Kaufman* for father.

SICHER, J. The father filed notice of appeal to the Appellate Division, Supreme Court, First Department, under section 58 of the Domestic Relations Court Act of the City of New York, from the order directing him to deliver the children to the mother subject to the continued supervision of the Children's Court pursuant to subdivision 1 of section 61 of the Domestic Relations Court Act of the City of New York. Then he procured from the Appellate Division a temporary stay and an order to show cause why such stay should not be continued until the determination of the appeal. But on June 20, 1950, that application for such stay was in all respects denied by the Appellate Division.

Notwithstanding such denial the father refused to turn the children over to the mother as ordered; and on September 11, 1950, the parties were before me on the mother's motion to punish the father for contempt (N. Y. City Dom. Rel. Ct. Act, § 57).

Initially, the father's attorney urged in his behalf that notwithstanding such express denial of the motion for a stay pending appeal the mere filing of a notice of appeal in itself effected such stay automatically. That contention was based on the specious argument that because only a notice of appeal is required for an appeal to the Appellate Division, as compared with the requirement of an undertaking to perfect an appeal to the Court of Appeals (Civ. Prac. Act, § 593), the filing of a notice of appeal from an order of the Children's Court *ipso facto* brought the father within the ambit of section 573 of the Civil

Practice Act: "Where an appeal to the appellate term or to the appellate division of the supreme court or to the court of appeals or otherwise shall have been perfected, and the other acts required to be done or to stay the execution of the judgment or order appealed from have been done, the appeal stays all proceedings to enforce the judgment or order appealed from".

But section 573 of the Civil Practice Act, must be read in conjunction with companion sections, such as section 614 of the Civil Practice Act, which provides: "Security is not required to perfect an appeal from the supreme court to the appellate division thereof; but except where it is otherwise specially prescribed by law, the appeal does not stay the execution of the judgment or order appealed from."

Although the section just quoted relates only to appeals from the Supreme Court, it is declaratory of a general principle, applicable to all appeals, namely, that "while an appeal regularly taken and perfected is taking its course in the appellate court, respondent may, notwithstanding, unless stayed proceed to enforce his judgment or order, and the appellant's only remedy is to enforce restitution when he becomes entitled." (*Matter of Meyer,* 209 N. Y. 59, 65, accord, 6 Carmody on New York Practice, § 185, p. 147.)

However, the need to apply against the defaulting father any of the sanctions of the Judiciary Law relating to civil or criminal contempt was averted by his surrendering the children to the mother subject to the supervision of the Children's Court and by an agreement between the parents concerning visitation and the amount of support to be contributed by the father. Such change of custody was effected on September 26, 1950, and supplemented by a December 15, 1950, Family Court consent support order for the deposit of $32.50 semimonthly.

At first the children and the mother resided in the home of the maternal grandmother, who cared for them while the mother was working. However, when that arrangement was found not satisfactory, the mother moved with the children to other quarters, gave up her job so as to care for them constantly, was allowed supplemental home relief assistance from the department of welfare of the city of New York, and has applied for a housing project apartment.

Supervision of the children continues, with favorable reports as to their welfare.

The foregoing opinion and supplemental opinion together illustrate the comparative functioning of the "neglected child"

jurisdiction of the Children's Court (implemented with a probation bureau and a psychiatric clinic) and of the custody jurisdiction of the Supreme Court (which now has no such adjuncts). (Cf. *Matter of House of Holy Family* [" *Montana* "], 177 Misc. 171.)