In the Matter of " DOROTHY DUBIN " and Another, Infants.[*]

Domestic Relations Court of the City of New York, Children's Court, Queens County, April 14, 1952.

*Joseph W. Finver* for " Sarah Dubin ", as mother.

*Albert H. Bushmann* for " Isaac Dubin ", as father.

SICHER, J.   Many hours have been allocated to the trial and study of this bitter controversy.   What emerges is a sorry picture of neurotic parents whose intense antagonism toward each other and in relation to their young daughter and son constrain an adjudication that " Dorothy ", born September 21, 1943, and " Benjamin ", born November 16, 1946, are

[*] The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details, in consonance with the spirit of section 52 of the Domestic Relations Court Act of the City of New York (L. 1933, ch. 482, as amd.).

" neglected children " within the meaning and scope of subdivision (17) of section 2 of the Domestic Relations Court Act of the City of New York.

Whether the rancors of the parents which occasioned this proceeding and previous Supreme Court actions and Magistrate's Court and Court of Special Sessions complaints originated from the mother's affiliation, or at least sympathy, with . the Communist party, as alleged by the father, or whether solely out of property wrangles, as asserted by the mother, the parents' bitter dissension calls for intervention of this court or the Supreme Court of the State of New York in their children's behalf.

The parties give the lie to each other on certain facts " of such an intimate character that necessarily the direct testimony must be oath against oath " (*Risk* v. *Risk*, 202 App. Div. 299, 302); and no useful purpose would be served by a detailed narrative of their conflicting testimony and that of the several other witnesses. Suffice it to state the following conclusions, reached after reflection upon *all* the evidence (including the demeanor of the parties) and the letter-briefs of counsel:

(1) The father is a high-strung, aggressive, meticulous, and neurotic individual, who is nevertheless deeply fond of his children and sincerely believes that they are not receiving proper guidance from their mother but who is so upset, and now so hostile to her, that he has been expressing to the children that animosity and his doubts about the mother's character and her care of them.

However, the evidence does not sustain the father's principal allegation that the mother has attempted already to indoctrinate the children with the materialistic ideology of communism. It was shown that the maternal grandfather had been a solicitor for an insurance organization which Supreme Court Justice HENRY CLAY GREENBERG recently adjudged communist-controlled; that many years ago while a pupil at X College the mother belonged to a pacifist group of fellow students; that her political views have alienated the friendship of one of the witnesses and his wife; that the mother may have distributed a June 25, 1950, pro-Soviet Union communication issued by the Queens Communist party, U.S.A.; that neither parent has been a member of a synagogue; and that the children had no religious training until the mother recently enrolled them in the Sunday school of the Y Jewish Community Center. But the totality of such insufficient evidence on those phases comes squarely within the language of Judge DESMOND's opinion in a March 13, 1952,

unanimous decision of the Court of Appeals (*People ex rel. Portnoy* v. *Strasser,* 303 N. Y. 539, 544): " The finding, then, that this mother so neglected her little girl as to justify a change in custody, must have been based on one or more of these considerations: first, that communistic activities occupied the mother's attention; * * * and, third, that the child was not being trained in the religion in which it was born. The testimony (vehemently denied by the defendant) as to membership and work in alleged Communist ' Front ' organizations was as of a period long before the trial and there was nothing to show that such associations continued, or that they were such as to make the mother unfit to rear her own infant * * *. As to the mother's failure to train the little girl in the faith of her father's, that, too, is within the parent's sole control (*Meyer* v. *Nebraska, supra; Pierce* v. *Society of Sisters,* 268 U. S. 510; *Zorach* v. *Clauson,* 303 N. Y. 161)."

See, also, subdivision 6 of section 61 of the Domestic Relations Court Act reading: " The jurisdiction herein conferred upon the children's court shall not be deemed to include (a) the right of the court to entertain an action, proceeding or motion where the sole issue or matter in controversy is the religious faith of a child, nor (b) any matter, action or proceedings having to do with separation or divorce, nor habeas corpus proceedings."

Nor does the evidence sustain the father's allegation that the children lack physical care. On the contrary, when seen in chambers by me and also previously by one of the court's most competent, experienced probation officers (Vera Vieser), they appeared well dressed and mannered, bright, alert, friendly, and attached to both parents. Also, their school reports show good attendance, behaviour and work, and co-operation from the mother.

However, that contact in chambers revealed traumatizing of the children, almost certain to develop serious maladjustment, by the parents' antagonism to each other. Thus, " Dorothy " said that she had been told by the mother that the father is " sick in the head " and " it will take ten years to cure him ". Significantly, " Dorothy " smiled happily with relief at my assurance that although her father was nervous he was not " sick in the head " and loved her very much.

It also came out in the course of that chambers hearing that " Dorothy " had witnessed in November, 1951, the night fracas between the parents which culminated in the latest separation and that her recollection of that emotional episode is painful to her.

The boy " Benjamin ", who is younger and less mature than " Dorothy ", also manifested the untoward pressures of the marital situation. Brought into chambers, and before spoken to by me, immediately he blurted out: " Mommie says that Hopalong Cassidy is a Communist ". Questioning made clear that this young boy did not understand the meaning of those words but was echoing something prompted by his father.

(2) On the other hand, it was satisfactorily proved that there is no basis for the mother's pretext that the children fear their father.

The testimony of the Rabbi who has supervised and observed the Sundays visitation at the Y Jewish Community Center ordered by Justice BOLIN, my talks with the children in chambers, and their behaviour during a midday luncheon meeting among both parents and probation officer Vieser (described on the record) abundantly show that they enjoy and welcome visitation with the father.

Moreover, the mother's reported conditioning of her consent to a visitation plan, otherwise acceptable to both parents, upon certain money payments by the father confirms my impression that her objections to visitation which partly occasioned this proceeding at the instance of this court's bureau of adjustment are primarily a vent for her own emotionalism and her hostility to her husband and also indicate a disposition to use the children as trading material in the financial controversy between the parents.

(3) The mother had previously instituted in the Supreme Court of the State of New York actions for separation and for an accounting of her alleged partnership interest in the father's retail store business and in realty jointly owned. Those actions were discontinued before trial, in May, 1951, upon a reconciliation, which, however, ended in November, 1951, and was followed by the afore-mentioned criminal court complaint and the instant proceeding in this court.

In that separation action there had been entered orders for temporary alimony of $65 a week, counsel fee of $400, and visitation every Sunday from 11:00 A.M. to 5:00 P.M., one week-end a month from 11:00 A.M. on a Saturday of such week-end until 5:00 P.M. on the ensuing Sunday and also at the mother's home every Wednesday evening from 6:00 P.M. to 7:30 P.M.

In a letter-brief the mother's counsel urges that any visitation be conditioned on the father's resuming the full amount of certain payments for food, clothing, and rent which he has reduced since the inception of this proceeding. The father's

counsel's letter-brief, in turn, seeks to justify such reduction, indicates the father's desire to '' withdraw from the present tribunal, if possible '', and to turn to the Supreme Court but requests a visitation order of the Children's Court meanwhile.

Both counsel thus misconceive somewhat the scope of a '' neglected children '' proceeding and the functions of this limited jurisdiction statutory court of enumerated powers only.

Unfortunately, in New York City there is lacking, and sorely needed, a single, modernized and adequately implemented court of general jurisdiction over all justiciable issues relating to child and family welfare. Instead, there exists a multiplicity of courts, with respective circumscribed jurisdictions which at some points are concurrent, at others conflicting, and nowhere comprehensive. (See N. Y. L. J., Sept. 19, 1949, p. 520, col. 1, and March, 1950, Virginia Law Weekly articles.) Even the matrimonial jurisdiction of the Supreme Court of the State of New York is wholly statutory (*Erkenbrach* v. *Erkenbrach,* 96 N. Y. 456; *Caldwell* v. *Caldwell,* 298 N. Y. 146); it has power to order support solely as an incident to a matrimonial action (*Johnson* v. *Johnson,* 206 N. Y. 561) and is without jurisdiction to entertain an independent petition for support (*Matter of Bedrick* v. *Bedrick,* 151 Misc. 4, affd. 241 App. Div. 807; *Langerman* v. *Langerman,* 303 N. Y. 465). Also, it is even doubtful whether the Supreme Court has power to order support in a habeas corpus child custody proceeding (*Matter of MacAlpine,* 50 N. Y. S. 2d 232, and cases therein cited, affd. *sub nom. People ex rel. MacAlpine* v. *MacAlpine,* 267 App. Div. 952; *People ex rel. Geismar* v. *Geismar,* 184 Misc. 897, 911; but see *Matter of Sandfort* v. *Sandfort,* 278 App. Div. 331). Besides, generally speaking, a father's rights of visitation and his primary duty of support are not reciprocal but independent of each other (see Grossman on New York Law of Domestic Relations, § 162, and cases cited; also the discussion in '' *Almandares* '' v. '' *Almandares* '', 186 Misc. 667).

Similarly, the Children's Court Division of this court has no jurisdiction to order support; that power is lodged exclusively in the separate Family Court Division and is exercisable only in an appropriate proceeding in the Family Court.

Moreover, in the absence of facts constituting neglect, only the Supreme Court has jurisdiction over custody (see *Matter of Schwartz,* 35 N. Y. S. 2d 930, and cases cited), either as an incident of a matrimonial action or in a habeas corpus proceeding when the parents are living in a state of separation without

being divorced (Domestic Relations Law, § 70) or they have been divorced outside the State of New York.

Even where there is, as here, a "neglected children" adjudication (cf. *Matter of Schwartz, supra; Matter of Cole*, 212 App. Div. 427), the Children's Court has jurisdiction only " to determine the question of the rightful custody of such children if their custody is subject to controversy and such custody or controversy relates to their immediate care." (N. Y. City Dom. Rel. Ct. Act, § 61, subd. 1.)

For the foregoing reasons:

(1) " Dorothy " and " Benjamin Dubin " are hereby adjudged " neglected children " within the meaning and scope of subdivision (17) of section 2 of the Domestic Relations Court Act.

(2) Pursuant to subdivisions 1 and 8 of section 61 and subdivision (b) of section 83 of the Domestic Relations Court Act their continued immediate care is hereby entrusted to the mother and they are paroled to her under supervision, subject to the following visitation by the father: Every other Sunday, beginning April 13, 1952, from 10:00 A.M. to 7:00 P.M., and on alternate week-ends, beginning Saturday, April 19, 1952, from 10:00 A.M. to Sunday 7:00 P.M.; he is to call for the children in front of the mother's home, and return them there and not enter the mother's apartment nor contact her. Neither parent shall discuss with either child the activities or conduct of the other parent nor the differences existing between them.

Such visitation is conditioned on the father's compliance with those conditions and shall be modified or terminated on proof of a material breach; and in any event visitation under this court's jurisdiction shall cease when and if the Supreme Court shall have made a superseding direction concerning custody or visitation.

As above explained, there is no power to order support in this proceeding, and that phase is necessarily delegated to the Supreme Court or the Family Court Division. Meanwhile, until entry of an order of the Supreme Court or of the Family Court Division in respect of support, it is earnestly urged that, if the father is as genuinely concerned with the children's welfare as he professes, he will voluntarily, and without prejudice, resume the prior payments of $40 a week to the wife and $105 a month to the landlord (the substantial equivalent of the aforementioned $65 weekly *pendente lite* separation action order).

(3) Because of the probable early recourse of the parties to the Supreme Court for a determination of the entire con-

troversy of custody, visitation, support and property interests and the excessive current case loads of the probation officers of this court, active supervision is suspended until further order but jurisdiction retained under the last sentence of subdivision 1 of section 61 of the Domestic Relations Court Act.

(4) Finally, it is suggested that, when and if the parties carry out the presently contemplated recourse to the Supreme Court, that tribunal consider the advisability of arranging psychiatric examinations of the parties and children comparable to the examinations which this court has power to order to be made in its clinic under subdivision 7 of section 61 of the Domestic Relations Court Act (see *Matter of " Bologna "*, 199 Misc. 705, article by William M. Wherry, " But Do the Children Get Justice? ", Bar Bulletin, New York County Lawyers' Association, Vol. 9, No. 3, p. 17, Nov., 1951, and *Krauss* v. *Krauss,* N. Y. L. J., April 11, 1952, p. 1458, col. 5).

Notice shall be given pursuant to the subjoined direction.