## In the Matter of "ALICE STANTON".*

Domestic Relations Court of the City of New York, Children's Court,
New York County, December 24, 1952.

---

\* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details, in consonance with the spirit of section 52 of the Domestic Relations Court Act (L. 1933, ch. 482).

*Herbert Robinson* for father, petitioner.

*Alexander W. Axelrod* for mother, respondent.

SICHER, J. This case illustrates the different, at times conflicting, functions of this specialized, but limited jurisdiction, court and of the New York Supreme Court and the need for integrated, adequately implemented Family Courts of comprehensive jurisdiction over all justiciable issues affecting child welfare. (See editorial N. Y. L. J., Nov. 21, 1952, p. 1238, col. 1; March 9 and 16, 1950, Va. L. Weekly, and articles by Judge PAUL W. ALEXANDER in Sept. 1952 Conn. Bar Journal; Aug. 1952 Jour. of Amer. Judicature Soc., and Sept. 1952 Federal Probation, p. 24.)

On June 13, 1952, Justice POLIER adjudicated '' Priscilla Stanton '' a '' neglected child '', within the meaning and scope of subdivision 17 of section 2 of the Domestic Relations Court Act of the City of New York.

That adjudication was based on evidence adduced at hearings on a petition which had been filed June 6, 1952, by '' Priscilla's '' father and which alleged improper guardianship and control by the mother in consequence of alcoholism, failure to provide a permanent home for the child '' Priscilla '' (born July 20, 1948) and having constantly shunted her among friends and relatives.

Section 83 of the Domestic Relations Court Act of the City of New York reads, insofar as pertinent:

'' The court, if satisfied by competent evidence, may adjudicate the child to be * * * neglected, and in such case shall render judgment as follows:

'' (d) Continue the proceeding and place the child in its own home or in the custody of a relative or other suitable person, or a duly authorized association, agency, society or institution, for a certain designated period subject to the orders of the court;

'' (f) Render such other and further judgment or make such other order or commitment as the court may be authorized by law to make.

'' (h) * * *

'' A child may be placed and continued * * * under supervision if neglected for such time as the court or justice may deem proper, but such period shall not continue in any case

beyond the twenty-first birthday of any child. Such * * * period of supervision, however, may extend beyond the time a child attains the age of sixteen years.''

Other relevant provisions of the governing statute are:

Section 61 of the Domestic Relations Court Act of the City of New York. '' Jurisdiction ''.

'' 1. Children. The children's court in each county shall have exclusive original jurisdiction within such county to hear and determine all cases or proceedings involving the hearing, trial, parole * * * remand or commitment of children actually or apparently under the age of sixteen years * * * who are, or who are alleged to be * * * (e) neglected * * *. *Such court shall also have jurisdiction in proceedings to determine the question of the rightful custody of such children if their custody is subject to controversy and such custody or controversy relates to their immediate care.* When jurisdiction shall have been obtained by the court in the case of any child, such child shall continue for the purpose of this act under the jurisdiction of the court until he becomes twenty-one years of age unless discharged prior thereto. * * *

'' 6. *The jurisdiction herein conferred upon the children's court shall not be deemed to include* * * * (b) any matter, action or proceedings having to do with separation or divorce, nor habeas corpus proceedings.

'' 7. In the exercise of its jurisdiction the court shall have power to order, either before, during or after a hearing a mental, physical or psychiatric examination of * * * a parent, guardian, custodian or other person having or seeking custody of a child.

'' 8. In any neglect proceeding in the children's division of the court in which a finding of neglect shall have been made, the court may make such reasonable order with respect to the conduct or behavior of a respondent in such proceeding as to the court may seem proper and necessary to prevent the continuance of such neglect. Such order may be made at any time during the period the court shall have such child under its supervision as herein elsewhere provided.'' (Emphasis supplied.)

In relation to the afore-mentioned adjudication and subsequent steps Justice Polier made the following indorsements, among others:

On June 10, 1952:

(On back of petition) '' Petitioner and respondent and witnesses. Hearing. Grandmother agrees to bring child in 6/12/52.

Respondent mother to be given final opportunity to produce any witnesses.''

(Under the caption, '' Justices' Memoranda ''.)

'' Father as per petition.

'' Miss N.: Took in mother & child — Living at C. Hotel — Told she'd been asked to leave & had no place to go. Saw mother under influence of liquor on various occasions. Disappeared for three nights. So got in touch with maternal grandmother. After one week could not tolerate it, mother disappeared & left '' Priscilla '' with her. Arranged to send '' Priscilla '' to country till father arrived.

'' Maternal grandmother (Mrs. ' Potter ') substantiates above; says mother has been drinking for years.''

On June 13, 1952, Justice POLIER directed a physical and psychiatric examination of the mother in this court's clinic and a probation bureau investigation, including inquiry through a comparable Children's Court in California as to the arrangements there for '' Priscilla '' proposed by the father. Pending completion of such investigation she was paroled to the maternal grandmother and the father advised to discontinue the $200 monthly United States Army allotment to the mother for herself and the child and to substitute the maternal grandmother as recipient; and he was also advised to consult counsel concerning his demand for permanent custody.

On July 23, 1952, after study of the probation bureau and psychiatric examination reports Justice POLIER paroled the child to the maternal grandmother under court supervision, on condition that the mother live elsewhere until she will have satisfied the court that she had rehabilitated herself and stopped drinking; the father was directed to provide support for '' Priscilla '' by an allotment to the maternal grandmother, a duplicate copy of Justice POLIER's order to that effect to be furnished to the father's counsel for the army authorities; and a progress report was scheduled for September 16, 1952.

Meanwhile, before completion of the investigation of the father's proffers of a suitable home in California, the maternal grandmother asked to be relieved of '' Priscilla's '' care, because of the mother's continued maladjustment and also the father's failure to furnish adequate and regular support. Accordingly, on August 27, 1952, Justice LORENCE remanded '' Priscilla '' to Cardinal McCloskey School and Home to October 1, 1952, where she is still being cared for under successive further remands expiring January 14, 1953.

On November 12, 1952, in ordinary course, the matter came before me as the Justice then sitting at New York County Children's Court, Part II. There were present the mother, the maternal grandmother, an attorney for the father, and probation officer Anna Szynkiewicz. At the conclusion of the hearing I continued the remand to Cardinal McCloskey School and Home until December 10, 1952, without prejudice to the father's rights in a Supreme Court habeas corpus proceeding under section 70 of the Domestic Relations Law, and indorsed on the petition: '' I am inclined at this time not to grant the father's application to have the child placed in a boarding home in California, for reasons stated on the record. But I shall study the brief filed today and discuss the question with Justice Polier, and grant reargument if I conclude that today's disposition is erroneous.''

On December 10, 1952, at my request, Justice Diserio continued the remand to January 14, 1953, to enable me to finish study of the ample record and the cases cited by the father's counsel.

After conferring with Justice Polier and analyzing the facts and law, for the following reasons I have decided to adhere to my original decision to request Catholic Home Bureau to seek a suitable boarding home at or near New York City subject to the further orders of this court in lieu of a boarding home in California licensed by the Department of Welfare of that State.

On October 26, 1939, at the age of twenty-four, the father enlisted as a private in the United States Army and he has since remained uninterruptedly in service, with the present rank of captain (battalion executive officer).

He has been stationed at Camp X in California since December, 1951, after having served in Japan and Korea for about three years beginning December, 1948; and he is amenable to transfer, from time to time, to other places in this country and abroad.

Both parents had been previously married and divorced. They met while the father was stationed at an army camp in New Jersey; they were married by a Justice of the Peace in Connecticut on February 8, 1946; and they lived together in New York City until some time in 1948. But they separated then, about the time of '' Priscilla's '' birth, and have never become reconciled.

The mother had first married one '' James McDonald '', to whom she bore a child, '' Rachel '', on July 24, 1941. But she divorced '' McDonald '' in December, 1945; and on July 23, 1952, '' Rachel '' also was adjudicated by Justice Polier a '' neglected

child '', and is presently paroled to her father under supervision of this court while residing in a foster home in New York City.

'' Priscilla '' is the father's only issue. His previous marriage was childless; and in 1943, his first wife procured a Mexican divorce. The record does not show whether or not it was of the '' mail order '' variety. If it were, '' Priscilla's '' father's marriage to her mother would be void for his lack of legal capacity to contract another marriage (*Caldwell* v. *Caldwell*, 298 N. Y. 146; *Querze* v. *Querze*, 290 N. Y. 13); and unless and until otherwise expressly directed in an annulment decree, that ineffectual marriage ceremony would render him a putative father only, with consequent limitations on his paternal rights and duties (see discussion in '' *Castellani* '' v. '' *Castellani* '', 176 Misc. 763, 765–769, affd. *sub nom. Capaldo* v. *Capaldo*, 263 App. Div. 984).

The invalidity of that Mexican divorce is not unlikely to be the basis of the annulment action which, according to a July 28, 1952, letter from the petitioner-father to Justice Polier, he had then started against the mother in California.

But the exact nature and status of that litigation are not known; the record is barren of particulars.

However, it does appear that the ground on which the father mainly based his demand that '' Priscilla '' be given immediately into his custody was that he intended to marry a Miss H. L. when and if he procure a judgment of annulment or divorce against '' Priscilla's '' mother; that such prospective third wife is a spinster whom he met during 1949, in Japan when he was stationed there and she was employed as a secretary with the Occupation Forces; that she does not plan to discontinue her present position with a business corporation in California but would have a friend take care of '' Priscilla '' during the day; and that she had never seen '' Priscilla '' nor had any experience with young children. So, the Los Angeles, California, probation officer who made the local investigation at this court's request recommended against placing '' Priscilla '' with Miss H. L. at this time; and in the afore-mentioned July 28, 1952, letter to Justice Polier the father also wrote: '' I am suing my wife for an annulment and have the proceedings already started in X, California. To continue, H. is perfectly willing to drop her job and take care of ' Priscilla ', but now that I view everything in retrospect I see whereby that wouldn't look too good from the standpoint of Society.''

Other pertinent excerpts from that letter are:

" However, I have several places that I could place her here in California with friends, but the point I wish to bring out is that I am not happy with the present arrangement of having her with Mrs. ' Potter '.

"Please do not misunderstand, I have nothing against Mrs. ' Potter ' and I sincerely admire her for having the moral courage to testify against her own daughter in Court, but she lets sentiment get the better of her good judgment, i.e. lets ' Priscilla ' do exactly as she pleased, which is not good at this impressionable stage, and again against her better judgment apparently has taken ' Alice ' into the C. Hotel with herself and ' Priscilla '. * * * ' Priscilla ' needs someone to look after her with a kind disposition yet with a firm and unswerving purpose in choosing a course and sticking with it. * * *

" I am conferring with Mr. Robinson again shortly to give the name of another party that I feel will be suitable in every way to take care of ' Priscilla ' until myself and H. can get married, but if in your opinion this is not feasible then *I would respectfully request that she be placed with a Catholic institution or other suitable place in neutral hands.* * * *

" I started the annulment proceedings against my wife upon my return from New York, but have not yet been summoned to Court. I have high hopes this will happen within the next thirty days.

" I do not mean to sound callous about the annulment, but this is no hasty decision and I can assure you I have given it a lot of thought over a period of years. In the final analysis I could never again reconcile myself to living with ' Alice '." (Emphasis supplied.)

The father's next plan was to place the child in the licensed boarding home of Mr. and Mrs. O. S., in X County, California, near the father's army post. But the X County Welfare Department wrote on September 23, 1952, that Mr. S. had suddenly died and that it would therefore be necessary to consider some other licensed boarding home — a development illustrating the inherent uncertainty and impermanence of boarding homes and the inadvisability of this court's approving placement of " Priscilla " in such a home remotely beyond the territorial jurisdiction of this court.

Additional counter-considerations are that the child does not know her father but is emotionally attached to the mother, maternal grandmother, and half-sister " Rachel ", and the

mother's understandable objection to " Priscilla's " removal to distant California.

On December 15, 1952, Cardinal McCloskey School and Home reported that, although the child had been upset, fearful and anxious when first remanded there, she now appears to be happy, is able to hold her own in her group, and is no longer timid or withdrawn; and that such improvement began when the mother started periodic visits, " Priscilla " being wrapped up in her mother and talking a great deal about her.

The July 11, 1952, psychiatric examination report on the mother shows that she has bright normal intelligence and is not psychotic but that there has been a history of chronic alcoholism, irresponsibility and egocentricity and that the prognosis for rehabilitation is unfavorable.

Seemingly, the father is much more stable; he professes deep interest in " Priscilla " and distress at the possibility of her being institutionalized; and he voices a desire to have her where he can visit and guide her. Besides, despite the separation from the mother since " Priscilla's " birth he has contributed to their support, and he went to the trouble and expense of traveling from California to New York City to institute this neglected child proceeding when alerted by the maternal grandmother. Certainly he should be encouraged to continue interest in " Priscilla " and to formulate suitable long-term plans for her welfare. Nevertheless, even assuming that he can, and will, eventually establish a permanent home for himself and " Priscilla " and the approximate equivalent of maternal care for a girl of tender years, all he offers at this time is placement in licensed boarding homes in California which this court would be unable to evaluate and where it could not supervise the child in the same manner as during a remand to a boarding home furnished by a private social agency in this State.

Weight must also be accorded to the limited scope of a " neglected child " proceeding in contrast with a habeas corpus permanent custody proceeding in the Supreme Court of the State of New York.

Indeed, that distinction is recognized and emphasized in cases cited by the father's counsel bearing on the jurisdiction of Children's Courts in this State outside New York City governed by the comparable provisions of the Children's Court Act of the State of New York, namely (*Matter of Walsh* v. *Walsh,* 146 Misc. 604; *Matter of Cole,* 212 App. Div. 427; *Matter of Caposella,* 255 App Div. 863, 987). The holding in each of those

cases is that the Supreme Court has exclusive jurisdiction over a contest for the custody of a child unless he or she will have been adjudicated delinquent or neglected. True, a dictum in *Matter of Cole* (*supra*) states that " On the other hand, where neglect is shown to exist, the exercise of jurisdiction by the Children's Court is beneficent and should be unhesitating, even though the result is an interference with the natural guardianship of a parent " (p. 429). Nevertheless, it was squarely ruled in *Matter of Caposella* (255 App. Div. 987, *supra*) that the " grant of jurisdiction, in section 6 " — Children's Court Act of the State of New York — " ' in proceedings to determine the question of the rightful custody of children whose custody is subject to controversy, as related to their immediate care ' " — language substantially identical with that of section 61 of the Domestic Relations Court Act of the City of New York quoted at (p. 135, *supra*) — " relates only to temporary disposition of the child's custody in cases where prompt action is necessary or desirable."

*Matter of Cullis* (N. Y. L. J., June 23, 1952, pp. 2648–9, cols. 6–8) not otherwise reported, a case on which the father's counsel principally relies, was a habeas corpus contest between parents for determination of the superior right of custody of children not delinquent or neglected; and decision turned on facts totally different from those involved in the instant neglected child proceeding, except that there too the father had been in the United States Army for several years and his enlistment would continue still another year. But the controversy arose from the mother's refusal to live with her husband and their children in quarters he had obtained at or near his present station in Massachusetts or, as an alternative, to obtain an apartment in New York City. The issue presented was largely a comparison of the greater desirability of the paternal grandparents' home in New York City over that of the maternal grandparents' home in Virginia. Placement of the children in the " willing and capable care of paternal grandparents ", of high quality, in whose home " the father will have a part in their upbringing and where, the Court is confident, the petitioner herself will be accorded similar opportunities and certainly ample and cordial visitation ", without prejudice to a future application by the mother for change of custody when and if she ceases employment and sets up a home for the children in New York City or near the husband's post, represents a fundamentally different disposition from the proposed placement of " Priscilla " in a department of

welfare licensed boarding home upwards of three thousand miles away from the mother.

Accordingly, this court will continue to exercise jurisdiction over " Priscilla " and her parents with the aid of its probation and psychiatric clinic staffs, the Catholic Home Bureau, and other co-operating private and public agencies, until superseded by judgment or order of the Supreme Court of the State of New York or other court of competent jurisdiction. And in the light of special facilities of this court which are unavailable to the New York Supreme Court (see *Matter of " Bologna "*, 199 Misc. 705; *Matter of House of Holy Family [" Montana "]*, 177 Misc. 171; *Matter of " Dubin "*, 201 Misc. 621; and article by William M. Wherry, " But Do the Children Get Justice? ", 9 Bar Bulletin, New York Co. Lawyers' Assn., p. 17), it is hoped, and urged, that the New York Supreme Court will be circumspect against terminating this court's supervision of " Priscilla " and uprooting her until the father is clearly able to furnish a permanent home and adequate care for a child of tender years.

This detailed opinion has therefore been prepared for the guidance of counsel and of the New York Supreme Court or other court in which may be venued litigation between " Priscilla's " parents in respect of her custody.

Notice shall be given pursuant to the subjoined direction.